United States District Court
Southern District of Texas
**ENTERED**
November 19, 2015
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARQUETTE TRANSPORTATION COMPANY, LLC, | § | |
| Plaintiff, | § | |
| VS. | § | Civ. A. H-15-494 |
| A CARGO OF INDUSTRIAL SAND SHIPPED ABOARD THE MTC 0148B, MTC 214B, MTC 2210, MTC 0118, and MTC 281B, *in rem*, | § | Admiralty Rule 9(h) |
| Defendants. | § | |

**OPINION AND ORDER**

Pending before the Court in the above referenced action pursuant to Supplemental Rule D of the Federal Rules of Civil Procedure,[1] to enforce a maritime lien *in rem* for the possession of maritime property, shipped pursuant to a maritime contract, to which Plaintiff Marquette Transportation Company, LLC ("Marquette") claims it is allegedly entitled of right, is Marquette's motion for summary judgment (instrument # 32). *In rem*

[1] Supplemental Rule D for Certain Admiralty and Maritime Claims provides in relevant part,

> In all actions for possession, partition, and to try title maintainable according to the course of the admiralty practice with respect to a vessel [and] in all actions so maintainable with respect to the possession of cargo or other maritime property . . . the process shall be by a warrant of arrest of the vessel, cargo, or other property, and by notice in the manner provided by Rule B(2) to the adverse party.

An "arrest" is the formal procedure by which the object of a maritime lien is brought within the in rem jurisdiction of the admiralty court by compliance with the requirements of Supplemental Rule C(3). *Nuta v. M/V FOUNTAS FOUR*, 753 F. Supp. 352, 353-54 (S.D. Fla. 1990).

Defendant Cargo, although served (#7, 8, 9), has failed to file a response.

Defendant Cargo is comprised of the following: 1,747 tons of wet industrial sand aboard the barge MTC 0148b; 1,710 tons of wet industrial sand aboard the barge MTC 214b; 1,741 tons of dry industrials and aboard the barge MTC 2210; 1,605 tons of wet industrial sand aboard the barge MTC 0118; and 1,735 tons of wet industrial sand aboard the barge MTC 281b (collectively, the "Cargo"). Marquette is the owner and operator of the barges, while FracXchange is the shipper of the Cargo. At the time this action was commenced and the Verified Original Complaint (#1) *in rem* was filed to enforce maritime lien, the Cargo was located within this District and within this Court's jurisdiction at Kirby Greens Bayou Fleet, 3100 Penn City Road, Houston, Texas 77015.[2]

The procedural history of the case is reflected on the docket sheet and in the filed instruments, so the Court does not summarize it, but lets the record speak for itself.

**Standard of Review**

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no

[2] Supplemental Rule C(2) requires in an *in rem* action to enforce a maritime lien that the complaint be verified, that the property which is the subject of the suit is described with reasonable particularity, and that the complaint states that the property is within the district or will be within the district while the action is pending.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the nonmovant bears the burden of proof at trial, the movant must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but does not have to, negate the elements of the nonmovant's case to prevail on summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998). "A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmovant may not rely merely on allegations, denials in a

pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir. 1998).

Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id., quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

Allegations in a plaintiff's complaint are not evidence. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir.

1996)("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.*, 14 F.3d 1056, 1060 (5th Cir. 1995)(for the party opposing the motion for summary judgment, "only evidence-–not argument, not facts in the complaint--will satisfy' the burden."), *citing Solo Serve Corp. v. Westown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991). The nonmovant must "go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial." *Giles v. General Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001), *citing Celotex*, 477 U.S. at 324.

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13. The Court may not make credibility determinations. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009), *citing Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007).

The Court has no obligation to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). Rather the nonmovant must identify evidence in the record and demonstrate how it supports his claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

It is well established in the Fifth Circuit that "[a] federal court may not grant a 'default' summary judgment where no

response has been filed." *Bradley v. Chevron U.S.A., Inc.*, No. Civ. A. 204CV092J, 2004 WL 2847463, *1 (N.D. Tex. Dec. 10, 2004), *citing Eversley v. MBank of Dallas*, 843 F.2d 172, 174 (5th Cir. 1988); *Hibernia Nat. Bank v. Administracion Cent. Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985). Nevertheless, if no response to the motion for summary judgment has been filed, the court may find as undisputed the statement of facts in the motion for summary judgment. *Id.* at *1 and n. 2*, citing id.*; *see also Thompson v. Eason*, 258 F. Supp. 2d 508, 515 (N.D. Tex. 2003)(where no opposition is filed, the nonmovant's unsworn pleadings are not competent summary judgment evidence and movant's evidence may be accepted as undisputed). *See also Unum Life Ins. Co. of America v. Long,* 227 F. Supp. 2d 609 (N.D. Tex. 2002)("Although the court may not enter a 'default' summary judgment, it may accept evidence submitted by [movant] as undisputed."); *Bookman v. Shubzda*, 945 F. Supp. 999, 1002 (N.D. Tex. 1996)("A summary judgment nonmovant who does not respond to the motion is relegated to [his] unsworn pleadings, which do not constitute summary judgment evidence.").

**Relevant Law**

Maritime liens are established by operation of law, from the usages of commerce, independent of the parties' agreement, and not from statutory regulations. *The Bird of Paradise* 72 U.S. (5 Wall.) 545, 555 (1866). As a "non-consensual and unrecorded special property interest" in a vessel or other *res, a* "[m]aritime lien [is a] privileged claim[] upon maritime property, designed to be carried into effect by the *in rem* legal

process available in admiralty." Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 8-1, at pp. 252, 247 (West 1987). A maritime lien serves as a "rough security device invented in the nineteenth century to keep ships moving in commerce while preventing them from escaping their debts by sailing away." *Id.* at 247. Such a lien, which is "a right to retain cargo until freight[3] (or charter hire) is paid," may be placed on cargo for freight due from the cargo owner to the ship or its operator. *Id.* at p. 251. *See also Arochem Corp. v. Wilomic, Inc.*, 962 F.2d 496, 499 (5th Cir. 1991)("Under United States law it has been settled for over a century that we presume a maritime lien exists in favor of a shipowner on cargo for charges incurred during the course of its carriage."). Because shipowners have a lien upon the cargo for freight, they may retain the goods after the arrival of the ship at the port of destination until the payment is made. *The Bird of Paradise*, 72 U.S. (5 Wall.) 545, 554 (1866). Indeed unlike an ordinary maritime lien, because a vessel owner's lien on the cargo for unpaid freight is "possessory," i.e., it "continues only so long as the cargo remains in the owner's actual or constructive possession," to preserve the lien the carrier must withhold the cargo. *Beverly Hills Nat'l Bank & Trust Co. v. Compagnia De Navegacione*

[3] "[F]reight is the reward payable to the carrier for the safe carriage and delivery of the goods. Under the so-called American rule, a shipper is not liable for freight for carriage of goods until the goods have been delivered to the final agreed destination. . . . [The American rule] can be varied by agreement." Schoenbaum, *Admiralty and Maritime Law* § 9-2 at p. 279.

*Almirante S.A.*, 437 F.2d 301, 304 (9th Cir. 1971). The creditor may also appropriate the vessel, have it sold, and then have the proceeds used to repay the debt owed to the creditor. Schoenbaum, *Admiralty and Maritime Law* § 8-1, at p. 252.

After a carrier asserts a maritime lien against cargo that has been carried on its vessel, the carrier can file a claim in rem against the cargo and a claim *in personam* against the shipper to recover unpaid freight. *Hawkespere Shipping Co., Ltd. v. Intamex, S.A.*, 330 F.3d 225 (4th Cir. 2002).

If after foreclosure and sale of a vessel there is insufficient money to pay all claims, the liens must be classified and prioritized, i.e., ranked and classified, to determine which should come first. Schoenbaum, *Admiralty and Maritime Law* §8-6 at p. 263.

In *New York Dock Co. v. The Poznan*, 274 U.S. 117, 121 (1927), the Supreme court held that although expenses and costs incurred while the vessel is under arrest (in *custodia legis*),[4] including wharfage[5] and goods and services provided during this period to preserve and maintain the vessel, cannot be subject to

---

[4] *See Gen. Elec. Credit & Leasing Corp. v. Drill Ship Mission Exploration*, 668 F.2d 811, 816 (5th Cir. 19882)(recoverable *custodia legis* expenses against the vessel usually include "services or property advanced to preserve and maintain the vessel under seizure, furnished upon authority of the court"). For a more extensive discussion of *custodia legis* expenses, see *Louisiana Intern. Marine, LLC v. Drilling Rig Atlas Century*, C.A. No. C-11-186, 2012 WL 2121401 (S.D. Tex. May 15, 2012), *report and recommendation adopted*, 2012 WL 2317541 (S.D. Tex. June 18, 2012).

[5] "Wharfage" is "[t]he money paid for landing goods upon, or loading them from, a wharf" or the "[c]harge for use of [a] wharf by way of rent or compensation." *Black's Law Dictionary* (6th ed. West 1990).

a maritime lien, a court exercising its equitable authority over the proceeds of the sale of the vessel may grant them priority status over maritime liens even though the are incurred without prior court order; "[t]he most elementary notion of justice would seem to require that services or property furnished upon the authority of the court or its officer, acting within his authority, for the common benefit of those interested in a fund administered by the court, should be paid from the funds as an 'expense of justice.'"[6] *Id.; Gen. Elec. Credit & Leasing Corp. v. Drill Ship Mission Exploration*, 668 F.2d 811, 816 (5th Cir. 1882). A district court, sitting in admiralty, has inherent equitable power to give priority to claims arising out of the administration of property within its jurisdiction where "equity and good conscience so require." *Id.*

Under Supplemental Rule C (1)(a), "an action in rem may be brought to enforce any maritime lien." Rule C1(a) further

---

[6] The Supreme Court further explained that these "expenses of justice," 274 U.S. at 121,

> Such preferential payments are mere incidents to the judicial administration of a fund. They are not to be explained in terms of equitable liens in the technical sense, such as the case with agreements that particular property shall be applied as security for the satisfaction of particular obligations or vendors' liens and the like, which are enforced by plenary suits in equity. They result rather from the self-imposed duty of the court, in the exercise of its accustomed jurisdiction, to require that expenses which have contributed either to the preservation or creation of the fund in its custody shall be paid before a general distribution among those entitled to receive it.

provides, “Except as otherwise provided by law a party who may proceed in rem may also, or in the alternative, proceed in personam against any person who may be liable.”

**Marquette’s Motion for Summary Judgment (#32)**

Marquette states the following uncontested facts. On December 9, 2014, Marquette and FracXchange.com, LLC (“FracXchange”) entered into a private contract of carriage for FracXchange to ship and Marquette to carry industrial sand to Corpus Christi. Barge Transportation Agreement, Ex. A (the “Contract”). In December 2014, FracXchange delivered to Marquette 1,747 tons of wet sand aboard the barge MTC 014b, 1,710 tons of wet industrial sand aboard the barge MTC 214b, 1,741 tons of dry industrial sand aboard the barge MTC 2210, 1,605 tons of wet industrial sand aboard the barge MTC 0118, and 1,735 tons of wet industrial sand aboard the barge MTC 281b for shipment to Corpus Christi, Texas. Ex. B, Affid. of Tom Vorholt, p.1 ¶ 2. Under the Contract, fifty percent of the freight charges was to be paid before the Cargo was loaded, and the remainder, before the Cargo arrived at its final destination. Ex. A, Part I, p.2. After FracXchange prepaid Marquette $162,500.00 as approximately half of the freight charges, Marquette began the carriage of the Cargo. Ex. B, Vorholt Affid., p. 1 ¶ 3. On December 31, 2014 Marquette invoiced FracXchange for the remaining freight charge in the amount of $170,482.00. Exhibit C. Marquette also issued an invoice to FracXchange for origin demurrage[7] of $600.00 and

---

[7] “Demurrage” is defined in *Black’s Law Dictionary* (6th ed. West 1990) as follows: “In maritime law, the sum which is

for the "first tow" payment of $22,000.[8] *Id.* at Invoice No. DO14-026855 and Invoice No. MI15-029106. Thus before the arrival in Corpus Christi, FracXchange owed Marquette a total of $198,082.00, due before the Cargo could be unloaded. Vorholt Affid., Ex. B, pp. 1-2 ¶ 4. On January 5, 2015 Marquette emailed FracXchange that the Cargo would soon arrive in Corpus Christi and that Marquette needed payment of the outstanding amount. Ex. D, E-mails dated January 5, 2015.

The Cargo arrived in Corpus Christi at 10:00 a.m. on January 11, 2015. Vorholt Affid., Ex. B, p. 2 ¶ 5. Because FracXchange had not paid the outstanding freight and demurrage charges nor executed a contract to use the destination dock, Marquette could not offload the Cargo. Ex. E, E-mails among FracXchange, Marquette, and Bay Ltd., dated January 8-9, 2015; Vorholt Affid., Ex. B, p. 2 ¶ 5.

Subsequently Marquette learned from FracXchange that the party which was to purchase the Cargo had backed out of the agreement and FracXchange was looking for an alternate buyer, but FracXchange promised to pay shortly. Ex F, E-mail exchange; Vorholt Affid., Ex. B, p.2 ¶ 6. Meanwhile destination demurrage

---

fixed by the contract of carriage, or which is allowed, as remuneration to the owner of a ship for the detention of his vessel beyond the number of days allowed by the charter-party for loading and unloading or for sailing."

[8] Under the Contract, FracXchange agreed to ship a minimum of 10,000 tons of industrial sand a month at the base rate of $39.00 per ton, with 50% to be paid before loading, and the other fifty percent plus an additional $22,000.00 on the first shipment to be paid prior to arrival at the destination port.

charges of $300 per hour per barge continued to mount. Contract, Ex. A at Part I, p.1. The Contract stated, *id.* at Part II, ¶ 3, that the barges would not be "released" for purposes of calculating destination demurrage until the "barge is unloaded and ready to be returned to Carrier."

FracXchange never paid the outstanding freight and demurrage, so the Cargo was never unloaded. Vorholt Affid., Ex. B, p. 2 ¶ 7. By the time this suit was filed, additional demurrage charges of $130,205.00, calculated from the time the Cargo reached Corpus Christi until 24:00 hours on January 31, 2015, less sixty free hours (12 hours per barge)(494.02 hours less 60 = 434.02 billable hours) had been incurred and been invoiced. Ex. C; Vorholt Affid., Ex. B, pp. 2-3 ¶ 8; Contract, Ex. A at Part I, p.1. Since this suit was filed, additional demurrage at $300.00 per hour accrued from February 1, 2015 at 0:00 hours to February 6, 2015 at 22:00 hours, when the barges arrived in fleet, for a total of $42,702.00 in additional demurrage (142.34 hours X 300). Exc. C, Invoice No. MI15-030721; Vorholt Affid., Ex. B, p. 3 ¶ 9. Marquette was unable to find any place to store the Cargo other than on the barges themselves and the only location it could find to float the barges while the Cargo was stored on them was in Houston. Vorhold Affid., Ex. B at p.3 ¶ 9. Thus the total of $401,686.50 in freight, demurrage, and fees related to the carriage of the Cargo pursuant to the Contract is due and owing to Marquette. *Id.* at p. 3 ¶ 10.

Furthermore, as substitute custodian (#6), Marquette incurred *custodia legis* expenses[9] related to seizure, maintenance, and sale of the Cargo, including the following: $537.82 charged to Marquette by the U.S. Marshal's Service to seize the Cargo; $49,478.00 to fleet the barges; $37,993.40 for miscellaneous fleeting and maintenance expenses incurred when heavy rains required Marquette to pump water off the barges, hire a crane to move sand to redistribute its weight between barges, and provide tows to move barges between fleets; $11,110.00 for insurance required by the U.S. Marshal while the Cargo was under arrest; $31,690.00 for a tow to transfer the barges back to Corpus Christi for unloading on May 10, 2014 at 9:00 a.m. to carry out the interlocutory sale ordered by the Court. Ex. G, Invoices; Vorholt Affid., Ex. B at p. 3 ¶ 11, p.4 ¶ 12. The sale took place on May 26, 2015 and Marquette deposited the proceeds, $221,988.00, in the Registry of the Court. *Id.*

Marquette seeks an order granting it summary judgment, foreclosing on Marquette's maritime lien for unpaid freight and demurrage, and awarding Marquette proceeds for the sale of the Cargo without prejudice to Marquette's seeking the deficiency in

---

[9] "No maritime lien can arise against a vessel while under arrest unless the arrest is colorable, and neither the master, owner, nor marshal can ordinarily affix a maritime lien to any vessel after seizure under legal process." 46 C.J.S. ("Effect of seizure of vessel under legal process" (database updated June 2015). "While in custodia legis expenses do not constitute a maritime lien, they are paid first in priority from the proceeds of a vessel sale, as an administrative cost." 56 *C.J.S.* "Claims for expenses in custodia legis" (database updated June 2015).

the amount of $312,347.14, owed to it from FracXchange LLC, *in personam*.[10]

**Court's Decision**

Marquette has met its burden as movant on summary judgment to support its claim that it is entitled as a matter of law to recover from the sale proceeds money first for *custodia legis* expenses and then for its maritime lien for unpaid freight and demurrage, an amount which exceeds the sum in the Registry of the Court. Neither the vessels nor the Cargo nor shipper FracXchange has filed a response and raised a genuine issue of material fact for trial or a legal issue relating to MARQUETTE's claim.

Accordingly, the Court

ORDERS that Marquette's motion for summary judgment (#32) is GRANTED, without prejudice to Marquette's subsequent right to seek any unsatisfied deficiency from FracXchange.com,

[10] The value of the Cargo (the sale proceeds of $221,988.00, now in the Court's Registry) was less than the total of the *custodia legis* expenses ($132,648.64) and the maritime lien for unpaid freight, demurrage, and fees related to the carriage of Cargo ($401,686.50). Besides the expenses listed in this Opinion and Order, FracXcange is also responsible for overdue charges, attorneys' fees and expenses for collection of the overdue freight, demurrage and arrest charges and any other costs related to transportation of the Cargo, so Marquette reserves the right to seek these damages against FracXchange after the maritime lien is resolved against the *res*.

LLC *in personam*.. Final judgment will issue by separate instrument.

**SIGNED** at Houston, Texas, this 19th day of November, 2015.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE